## THE UNITED STATES DISTRICT COURT
## NORTHER DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:  1:16CR79 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| LUIS EDILBERTO DIAZ-CORDOVA, | ) | |
| YANDY MARTINEZ-GUERRA, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the Court on Motions to Suppress filed by Defendants Luis Edilberto Diaz-Cordova and Yandy Martinez-Guerra.  Docs. 18, 19, 20. The Government timely responded to the motions. Doc. 21.  The Court conducted an evidentiary hearing on April 26, 2016.  The hearing was scheduled to reconvene on May 16, 2016.  However, at that time, Defendants declined to put on any further evidence. The Court then allowed for supplemental briefing based upon the hearing. Upon review of the relevant filings and applicable law, the Court DENIES the pending motions.

### I.     Facts

On February 17, 2016, Special Agent Brian Roman of the Department of Homeland Security Investigations was conducting routine checks of hotels in the Medina area with Agent John Stayrook of the Medina County Drug Task Force.  The officers indicated that their focus was drawn to Room 141 of the Red Roof Inn based upon several facts that on their face may appear innocent.  Specifically, the agents noted that the room was rented by two individuals with a rental car from Florida and the room was paid for with a prepaid Visa.  Based upon a check on the vehicle, agents learned that the

room was rented by Martinez-Guerra and that the vehicle was as well.   The vehicle had been rented from Miami Airport on February 9, 2016 and was due back in Miami on February 19, 2016.

Based upon the above facts, the agents deemed it worthwhile to set up surveillance on Martinez-Guerra.   At approximately 10:45 a.m., Defendants left their hotel room, first stopping at the office of the hotel.  The agents learned that the stop at the office was to extend the hotel stay by one additional night.  Defendants then proceeded to eat breakfast at a local Denny's restaurant.  Following that stop, Defendants proceeded to the Medina Home Depot.  Diaz-Cordova exited the vehicle and entered the store.  Diaz-Cordova purchased a towel rack and several gift cards using a credit card.  Diaz-Cordova then left the store and returned to the rental car.  Defendants then proceeded directly to the Brunswick Home Depot.  Once again, Diaz-Cordova exited the vehicle and entered the store.  Diaz-Cordova then approached the checkout with a showerhead and several gift cards.  Agent Roman observed some difficulty in processing the transaction.  When a second clerk approached to assist, Diaz-Cordova purchased solely the showerhead with a credit card and did not complete a purchase of the gift cards.

Based upon the agents' observations, Agent Roman believed that some form of credit card fraud was taking place.  As such, the agents determined that they would utilize the highway patrol to effectuate a traffic stop at the first opportunity.  To facilitate the traffic stop, the agents had earlier contacted State Trooper Robison to inform him that his services could be needed later in the date.  After the second Home Depot stop, the agents once again ensured that Trooper Robison was nearby and able to effectuate the traffic stop.

2

The stop was based upon traffic infractions observed by Agent Stayrook while traveling behind the vehicle.  Agent Stayrook relayed to Trooper Robison that the vehicle had twice failed to use turn signals – once when entering the highway and once when changing lanes.  Armed with that information, Trooper Robison stopped the vehicle. Trooper Robison then began the stop with his routine questions and asked for identification from both Defendants.  While walking back to his car to run the licenses, Trooper Robison allowed Agent Roman and Agent Stayrook to examine the licenses. While Trooper Robison ran the licenses, Agent Roman and Agent Stayrook began questioning Defendants.  Diaz-Cordova was removed from the vehicle and stood behind with Agent Stayrook.  Agent Roman then spoke to Martinez-Guerra, the driver, through the passenger's door.  According to Agent Roman, Martinez-Guerra gave permission to search the car.  In addition, a pat down of Diaz-Cordova led to the removal of his wallet. A subsequent search of the wallet revealed a drivers' license with the same photo but a different name. Running that license led to no results, demonstrating it to be fictitious.

The vehicle was then searched.  More counterfeit access devices were located within the vehicle.  Subsequently, the Red Roof hotel room was searched and additional contraband was found.   Defendants now move to suppress all of the evidence that was seized.

### III. Law & Analysis

### A. The Traffic Stop

Defendants first contend that the traffic stop was unlawful.  The Court finds no merit in this contention.

"Stopping and detaining a motorist constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (internal quotation marks omitted). Passengers, like Diaz-Cordova, are also considered seized during a traffic stop. *Brendlin v. California*, 551 U.S. 249, 263 (2007). This Court reviews the reasonableness of police conduct in effectuating a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Hill*, 195 F.3d 258, 263–64 (6th Cir. 1999). "In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop. We first ask whether there was a proper basis for the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation marks omitted). If the stop was proper, the Court must ask "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (internal omissions and quotation marks omitted).

Defendants first ask that this Court find that Agent Stayrook effectively committed perjury when he testified that he observed two traffic infractions prior to the traffic stop. Defendants contend that it is all too large a coincidence that Agent Stayrook observed these infractions from several cars behind the Defendants' vehicle. However, there is nothing in the record to support these assertions. Agent Stayrook testified that he clearly observed the traffic infractions and relayed the information to Trooper Robison. As such, the record demonstrates that there was sufficient cause to begin the traffic stop.

To the extent that Defendants claim that the agents had an ulterior purpose when the stop was effectuated, Defendants' argument regarding pretext lacks any merit because

4

the legality of a traffic stop does not hinge on an officer's internal motivation. *See Whren v. United States*, 517 U.S. 806, 812–13 (1996). "[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle." *United States v. Hill*, 195 F. 3d 258, 264 (6th Cir. 1999)). As Agent Stayrook personally observed the traffic infractions and relayed them to the trooper, there was probable cause to initially stop the vehicle.

**B. Duration of the Traffic Stop**

Defendants next contend that the stop was impermissibly extended. In so arguing, Defendants ignore several key factors. "To detain the motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Herein, from the onset of the stop, Agents Roman and Stayrook had a reasonable, articulable suspicion that Defendants were engaging in credit card fraud. This suspicion was generated from the following facts: Defendants were paying for their hotel room with a prepaid credit card. Upon leaving their hotel room, they stopped at two consecutive Home Depot stores and attempted to purchase gift cards with a credit card at both stores. When confronted with difficulties purchasing the gift cards at the second store, Defendants immediately abandoned their attempt to complete that purchase. Finally, Defendants made these stops after telling the hotel clerk that they were intending to travel to Detroit that day. As such, from the inception of the traffic stop, the agents were justified in investigation their reasonable suspicion that Defendants were engaging in credit card fraud.

5

Based upon the above, Defendants' arguments that the scope of the stop was unjustifiably extended lack merit. The agents' questions were focused upon the credit card fraud and did not unduly extend the duration of the stop beyond the need to investigate that activity.

## C. Consent to Search

Defendant Martinez-Guerra contends that any consent to search the car was improperly obtained. This Court disagrees.

Consent must be proved by clear and positive testimony and must be unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion. *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir. 1985). Moreover, in a warrantless search, the government bears the burden of proving consent. *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1989).

> The determination of whether consent was valid is a fact-specific inquiry that must be determined by the totality of the circumstances. *See Riascos–Suarez*, 73 F.3d at 625. In conducting such an inquiry, the court should examine, inter alia, the following factors: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Id*.

*United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). "In addition to these factors, we note that although law enforcement officials are not required to inform criminal suspects of their right to refuse consent to a search, knowledge of the right to refuse consent is one factor to be taken into account." *Id.* at 386-87 (citations and quotation omitted).

Martinez-Guerra is correct that he was not informed of his right to refuse consent and had not been informed of his constitutional rights when the request for consent was

made.  However, those are the only factors that favor his argument.  Martinez-Guerra was twenty-five at the time of the stop.  There is nothing in the record to suggest he has any education difficulties or that he has any form of substandard intelligence.  To counter these facts, counsel attempts to argue that the record is unclear whether Martinez-Guerra understood the question posed by the agent when asking for consent.  Martinez-Guerra contends that the agent used two different terms for search and repeatedly switched back and forth between English and Spanish when questioning Martinez-Guerra.

The record, however, does not support any conclusion that Martinez-Guerra did not understand the question as posed by Agent Roman.  First, Martinez-Guerra was able to respond to citizenship questions by informing the agent that he was a lawful permanent resident.  Martinez-Guerra was also able to respond to questions about his activities prior to the traffic stop and about where he was driving to when the stop was initiated.  As such, all these facts run counter to any argument that Martinez-Guerra was unable to converse with Agent Roman.  Moreover, Martinez-Guerra did not subsequently object to the search of the car while it was ongoing, again suggesting that he was fully aware that he had given his consent to search the vehicle.  Finally, the Court would note that when Trooper Robison approached the vehicle and it appeared that Martinez-Guerra did not understand his question, Martinez-Guerra looked to Diaz-Cordova for assistance.  Nothing in the record suggests that Martinez-Guerra sought out any such assistance once he began to deal with Agent Roman.  As such, the following facts are present: Agent Roman testified that Martinez-Guerra responded in the affirmative to the request for consent to search; Martinez-Guerra has no deficiencies in his education or intelligence that appear in the record:  there is no evidence that any language barrier served as an

7

impediment to the consent; and the agents engaged in no coercive or punishing conduct. Accordingly, the record has clear and positive evidence that consent was unequivocally, specifically, and intelligently given.  Defendants' argument to the contrary, therefore, lacks merit.

## D.  Pat Down and Wallet Search

Above, the Court concluded that the stop and search of the vehicle was permissible.  Counsel for Diaz-Cordova concedes that any search of his wallet would fall under the inevitable discovery doctrine if the initial stop and search were upheld.  As such, this Court need not review the arguments regarding whether the pat down and search of the wallet were permissible.

## E.  Consent to Search Hotel Room

Upon review, there is nothing in the record to support any claim that Martinez-Guerra's consent to search the hotel room was not properly obtained.  Moreover, it does not appear that counsel raises any such argument in his post-hearing briefing.  In any event, for the same reasons stated above with respect to the search of the vehicle, the Government has properly demonstrated that Martinez-Guerra consented to the search of the hotel room.

### IV. Conclusion

For the reasons set forth herein, Defendants' Motions to Suppress are DENIED.

IT IS SO ORDERED.

July 14, 2016 _____         _____/s/ Judge John R. Adams_____
                                                 JUDGE JOHN R. ADAMS
                                                 UNITED STATES DISTRICT COURT